DAVIES et al. v. HOTCHKISS.

(Supreme Court, Appellate Term.   June 30, 1908.)

1. EVIDENCE—COLLATERAL AGREEMENTS—ADMISSIBILITY OF EVIDENCE.

Where plaintiff agreed in writing to rent defendant a house for the summer at a stipulated rental, and prior to the written agreement, during the negotiations, agreed orally to make certain repairs and to furnish the house with certain furniture, evidence of such oral agreement was properly admitted in an action for rent; it being an independent collateral agreement preceding the written lease.    .

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, § 2037.]

2. LANDLORD AND TENANT—BREACH OF CONTRACT BY LANDLORD—DAMAGES.

Where defendant leased a furnished house from plaintiff for the summer, the latter to furnish and repair the house as agreed, if defendant was deprived of possession of the house for two weeks because of its uninhabitable condition, the proportionate rental for that period would have been defendant's measure of damages.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 32, Landlord and Tenant, § 841.]

3. SAME—ACTION FOR RENT—EVIDENCE—POSSESSION OF TENANT.

In an action for rent, where defendant set up a counterclaim for damages for being kept out of the house from June 1st to June 14th, because of its uninhabitable condition, the evidence *held* insufficient to show that defendant intended to take possession of the house on June 2d, even if it had been furnished as agreed.

4. SAME—COUNTERCLAIM BY TENANT.

Where plaintiff leased defendant a furnished house and agreed to furnish and deliver possession June 1st, even if the house was in an untenantable condition at that time, defendant could not recover actual damages by way of counterclaim for plaintiff's failure to have it in proper condition, unless defendant had intended to take possession at that time and was thereby deprived of doing so.

5. SAME—EVIDENCE—CONDITION OF PREMISES.

In an action for rent of a house from June 2d to June 14th, where defendant set up a counterclaim for damages on the ground that he was prevented from moving into the house during the first two weeks of June, because it was then uninhabitable, the evidence showing that the house was in practically the same condition on June 14th, when defendant moved in, as on June 2d, it cannot be said that its condition between those dates was uninhabitable, so as to entitle defendant to deduct the rent for that period on that ground.

6. SAME—TERMINATION BY TENANT—RESCISSION—EVIDENCE.

Where defendant leased a furnished house from plaintiff, the latter agreeing to have it ready for possession on June 1st, but it was not furnished at that time as agreed, and plaintiff promised to make it suitable for occupation by June 14th, whereupon defendant agreed to take it if it was then in condition, defendant did not thereby rescind the lease because of plaintiff's failure to have it furnished on June 1st as agreed.

7. SAME — BREACH OF LANDLORD'S AGREEMENT TO FURNISH—MEASURE OF DAMAGES.

Where plaintiff agreed to give defendant possession of a furnished house on June 1st, but the house was not furnished at that time as agreed, and defendant thereafter accepted it in its defective condition, his measure of damages was the difference between the rental value of the premises as they were and their rental value as they would have been if repaired and furnished as agreed, or, if defendant had made the stipulated repairs himself, he could recoup the necessary expenditures in making such repairs.

8. EVIDENCE—JUDICIAL NOTICE—DEPRECIATION IN VALUE.

In an action for rent, where defendant set up a counterclaim for damages for the breach of plaintiff's contract to repair and furnish the house before defendant took possession, even though the evidence showed that necessary repairs had not been made and adequate furniture installed, the Supreme Court will not take judicial notice of the fact that the value of the premises was thereby impaired; there being no evidence of such impairment.

Appeal from Municipal Court, Borough of Manhattan, Fifth District.

Action for rent by William G. Davies and others against Henry D. Hotchkiss, in which defendant set up a counterclaim. From a judgment for plaintiff and against defendant on his counterclaim, the latter appeals. Affirmed:

The following is the opinion of Spiegelberg, J., in the lower court:

During the month of April, 1906, the defendant, a prominent member of the New York bar, accompanied by his wife, visited the premises in question, situated at East Hampton, Long Island, in search of a country residence for the ensuing summer. He was attracted by the location and appearance of the house, but found the interior in bad repair, in great disorder, and in want of considerable furniture, rugs, and other household goods. Upon his return to New York he opened negotiations with the plaintiffs, who are the attorneys in fact for the owners of the property in question, for a lease thereof for the summer season. In view of the unsatisfactory condition of the house, the defendant insisted that the necessary repairs should be made and that it should be replenished with proper furniture and other articles which he deemed essential for a gentleman's country residence. Pending the negotiations the defendant was informed by a representative of the plaintiffs that a few pieces of furniture would have to be removed at the instance of an adverse claimant, but that the same would be replaced from a city house owned by the owners of the country property. As a matter of fact, more articles than indicated to the defendant were thus taken from the place. The demands of the defendant as to the additions of furniture and the repairs were agreed to by the plaintiffs, and thereupon, on May 24, 1906, the parties entered into a written lease for the term of five months beginning on the 1st day of June, 1906, at a rental of $2,000, payable in two equal installments of $1,000 on the 1st day of June, 1906, and the 15th day of August, 1906. Although the plaintiffs' agreement to make repairs and to provide household articles, as hereinbefore referred to, was not incorporated in the written lease, I am of the opinion that the evidence in regard thereto was properly admitted, on the ground that it amounted to an independent collateral agreement preceding the written lease. Van Brunt v. Day, 81 N. Y. 251; Tobey v. Mattimore, 54 Misc. Rep. 231, 104 N. Y. Supp. 393. I also find, as a matter of fact, that the plaintiffs violated the collateral agreement, not alone in that they failed to place the property in the condition demanded by the defendant and agreed to by the plaintiffs, but also in that they allowed the already meager equipment of this country place to be further depleted by the removal on the part of the adverse claimant hereinabove referred to of considerably more property than consented to by the defendant in his interview with the plaintiffs' representative.

On June 2, 1906, the defendant's wife visited the premises, and found that the house was not in such condition as the defendant had the right to expect. The landlords' failure to comply with the terms of the collateral agreement consisted, not merely in some minor particulars, but in very essential portions thereof. Upon returning to New York the defendant's wife (the defendant on account of illness was prevented from taking part in any matter connected herewith until the end of June) communicated with the representative of the plaintiffs, who promised again that matters would be righted, and allowed Mrs. Hotchkiss $125 to procure the needed blankets, shades, glassware, and other odds and ends. He further stated that the necessary furniture and

rugs would be sent there forthwith, and that the other repairs would be attended to, so as to put the place in good condition. On June 14, 1906, the defendant's family went to East Hampton to take up their summer residence, but found that conditions were not much different from what Mrs. Hotchkiss had found them to be on the 2d of June. In fact, on account of the defective kitchen range they had to remain for two days at some other place until the repairs were made. It was not until the middle of July that the premises were placed in such condition as to permit the occupants thereof to enjoy an even moderate degree of comfort. The sum allowed to the defendant by the plaintiffs for household articles and repairs had in the meantime been increased from $125 to $188. The defendant, having paid the first installment of rent of $1,000, deducted from the second installment the sum of $200, which he claimed as his damages for the plaintiffs' failure to put the house in proper condition. This action is brought by the plaintiffs for the recovery of the sum thus deducted, and the defendant, having in the amendment of his answer, which was allowed at the trial, admitted his liability therefor under the written lease, claimed the sum of $200 by way of counterclaim for his damages.

The theory upon which the defendant's counterclaim is based does not appear with great clearness; but he can recover upon the collateral agreement of the landlords to make repairs and provide the furniture, if he has proved damages cognizable by law. I am constrained to hold that the defendant has failed to do this. The defendant claims that, the house having been uninhabitable for the first two weeks in June, he was for that period deprived of the use thereof, and entitled to recover from the plaintiffs the proportionate rent for those two weeks, amounting to the sum of $200. To use the defendant's own words: "The rent of these premises was for a period of five months at $2,000, which would be at the rate of $400 per month, if they had been fully furnished and in order as represented. I concluded from that that $200 was certainly not an unfair estimate of the value of these premises for half a month from the landlords' standpoint." And again: "This is what I claim: That the original term of the lease was from the 1st of June to the 1st of November. When I discovered that the premises were not as represented, when, as Mrs. Hotchkiss has testified, she refused to take possession, the plaintiffs' representative promised to put them in possession by the 14th, and not until the 14th was possession delivered, and then we took possession and found things as they have been described, so that for the period from the 1st of June to the 15th of June there was no occupancy, there was no possession, there was a repudiation of the original lease, and possession was only taken on the 15th of June, because of the representation, which afterwards proved to be untrue, with respect to what had been done or what would be done to make the premises habitable. Q. And you considered that the value of this lease was $1,800? A. No more; no more than $1,800. Q. Well, then, the value of this lease at $1,800 is apportioned over the entire period? A. No; I have credited the value of $1,800 from the 15th of June until the 1st of November."

If the defendant on June 2d had refused to take possession of the premises, he would have been, in my opinion, justified in doing so. It may also be admitted that if, on account of the uninhabitable condition of the house, the defendant had been actually deprived of the possession thereof for the period of two weeks, then the proportionate rental would have been the measure of damages. These premises, being admittedly intended for a summer residence, were absolutely worthless to the defendant unless they had sufficient furniture. I do not agree with the contention of the plaintiffs, in this respect, that even without furniture there was a rentable value as far as the defendant was concerned. It was, however, incumbent upon the defendant to prove that he or his family would have moved into the house on June 2d but for its uninhabitable condition. Does the evidence show that the defendant intended to take possession on June 2, 1906, and was kept out of possession on account of the condition of these premises? Mrs. Hotchkiss, being examined as to the arrangement that she made, after her visit on June 2, 1906, with the plaintiffs' representative, testified as follows: "Q. You made some arrangement with Mr. Alexander, and you told Mr. Alexander you would rather give up

the house than take possession? A. I did. Q. And he told you what? A. That it would be made all right. Q. Did he tell you when it would be made all right? A. No; I don't remember that. Only I said to him that we were all dismantled at my own home, and that I wanted it not later than the 14th, as I wanted to go there by that time, and he said it would be all right for us at that time. Q. Then what did you say at that time—that you were willing to go if it were made ready? A. Yes." And again Mrs. Hotchkiss testifies: "Q. When you went there on June 2d, you went there for the purpose of a visit? A. I went there to look at the place. Q. It was not your intention to take possession of the house with your family then? A. I would have gone as early as I could. We were all dismantled in town, and I wished to go as early as possible. I told Mr. Alexander we must go by the 15th."

Can any inference be drawn from this testimony that the defendant intended to take possession on June 2d, and was only prevented by the uninhabitable condition of the premises? It may be true that the house was not fit for occupancy; but, unless the defendant was actually deprived of its possession when he was ready to take possession thereof, no basis for actual damages as claimed by the defendant is established. Mrs. Hotchkiss said that she did not go there on June 2d for the purpose of taking possession. She wished to go there as early as possible after June 2d, and she had to go by the 15th. Nor do I think that according to the defendant's own testimony the premises were actually uninhabitable on the 2d of June, no matter how uncomfortable a residence therein may have been. It does not appear that any material change took place between the 2d of June and the 14th. Mrs Hotchkiss testifies, referring to the condition of the house on June 14th: "These things had not been replaced, and the kitchen range was in such condition that we had to go over to Mrs. Osborne's, and stayed for two days while that was being repaired, for there came a cold northeast wind and rain, and we wanted furnace heat, and the grate was broken there, and we had to send for another grate and could not use it"—and proceeds to show minutely that nothing had been done between June 2d and June 14th to carry out the landlords' promises. And again Mrs. Hotchkiss says: "Q. Was there less furniture or more furniture on June 14th than there was on June 2d? A. Just the same as when I went there on the 2d. That was the trouble. I did not see anything replaced at all. Q. Was there any additional furniture put in between June 2d and June 14th, as far as you know? A. No; not one piece." Now, if the premises, notwithstanding their bad condition, were considered by the defendant fit for occupancy on June 14th, it necessarily follows that they were capable of being used for the same purpose on June 2d, when, as a matter of fact, the same conditions prevailed. It follows, therefore, that this court cannot hold that the condition of the house for the first two weeks of June was such as would entitle the defendant to deduct the entire proportionate rent therefor.

Nor do the facts justify a finding that on June 2, 1906, the lease of May 24, 1906, was abrogated by the defendant upon his discovery of the landords' failure to comply with the collateral agreement and that a new oral lease beginning June 14th was substituted. The evidence of Mrs. Hotchkiss as to her conversations with Alexander, the plaintiffs' representative, after her visit on June 2d, falls far short of establishing a rescission of the lease of May 24, 1906. The defendant, relying upon the unredeemed promises of plaintiffs' representative, was placed by the exigencies of the case in such a position that he either had to waive his legal rights and submit to the inconvenience and annoyance of a badly furnished and equipped summer house, or repudiate the lease and at perhaps greater inconvenience to himself and his family remain in the city or on short notice look around for some other summer place. The testimony leaves no doubt in my mind that the defendant by his own acts waived whatever rights he may have had up to June 14th.

After the defendant had accepted the premises, he was restricted in his claim for damages within the rule laid down in Reiner v. Jones, 38 App. Div. 441, 56 N. Y. Supp. 423, as follows: "The defendant's measure of damages in a case like the present would seem to be the difference between the rental value of the premises as they were and the rental value thereof as they would have been if repaired in accordance with the landlord's covenant; or,

if the tenant had actually made the stipulated repairs himself, he could recover or recoup the necessary expenditure in making such repairs." If the defendant had or could have shown the difference between the value of the premises in the condition in which they ought to have been delivered to him and the value thereof in the condition in which they were during his occupancy, I think a foundation for damages would have been laid. This case, however, is barren of any testimony in support of such measure of damages, and in its absence I think it improper to take judicial notice of the fact that the value of the premises was impaired by the lack of needed repairs and adequate furniture.

I am therefore reluctantly compelled to dismiss the defendant's counterclaim and direct judgment for the plaintiffs.

Argued before GILDERSLEEVE, P. J., and MacLEAN and SEABURY, JJ.

Hotchkiss & Barber, for appellant.

Davies, Stone & Auerbach, for respondents.

PER CURIAM. Judgment affirmed, with costs, on the opinion of the court below.

---

(59 Misc. Rep. 256.)

STOKES v. PHELPS MISSION et al.

(Supreme Court, Special Term, New York County. May, 1908.)

DISMISSAL AND NONSUIT—GROUNDS—WANT OF PROSECUTION.

A trustee of a charitable corporation sued in 1886 to prevent consolidation with a religious corporation. Issue was joined in 1888, and in 1890 the case was marked on the calendar "reserved generally," and no further action was taken until 1907, when defendant moved to dismiss for plaintiff's delay. The motion was denied on terms afterwards modified on appeal, and, no motion ever having been made to vacate or reverse the order for consolidation passed in 1887, the religious corporation having taken over the property of the charitable corporation and since administered the charity, and spent large sums of money in continuing it, plaintiff's laches in failing to promptly prosecute his action was fatal.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 17, Dismissal and Nonsuit, §§ 140, 141.]

Action by William E. D. Stokes, as trustee of the Phelps Mission, against the Phelps Mission and others to prevent the consolidation of such corporation with a religious corporation. Dismissed.

Olin, Clark & Phelps (John C. Clark, of counsel), for plaintiff.

William L. Snyder (Theron G. Strong and Michael Kirtland, of counsel), for defendants.

FITZGERALD, J. Upon the petition and the agreement to consolidate of the Phelps Mission, a religious corporation, and the trustees of the Eighty-Fourth Street Presbyterian Church, an order of this court was made about January 8, 1887, granting the prayer of the petitioners uniting and consolidating these two organizations into one corporation under the name of the Park Presbyterian Church. About November 20, 1886, plaintiff, as trustee of the Phelps Mission, began an action against Henry Dale and others and the Phelps Mission. The relief therein demanded was to enjoin the defendants "from entering